MARK J. O'BRIEN
Florida Bar No. 0160210, Massachusetts Bar No. 639865, Montana Bar No. 14114
Bayshore Executive Center
511 West Bay Street
Suite 330
Tampa, Florida 33606
T: (813) 228-6989
Attorney for the Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | | |
|---|---|---|
| United States of America | : | **No.:  CR-23-00680-PHX-DJH** |
| Plaintiff, | : | |
| | : | |
| v. | : | **DEFENDANT JORDAN PERSAD'S** |
| | : | **SENTENCING MEMORANDUM** |
| | : | |
| JORDAN PERSAD | : | |
| Defendant, | : | |
| _____ | : | |

*Introduction*

On Monday, October 23, 2023 at 3:00 pm, the Defendant, Jordan Persad, will stand in judgment before this Honorable Court for those crimes he committed - and for those crimes he accepted full responsibility for committing. The Defendant nor his counsel will minimize the negative effect the Defendant's criminal conduct has had and will continue to have upon his victims, this Honorable Court, the government, various state and federal law enforcement agencies throughout the country, his family, his friends, and himself.

The larger question, as it is in all of these types of cases, is why? Why commit a crime and end up in a foreign country thousands of miles away from your home for something so obviously morally and lawfully wrong? And why do it, when everyone else who commits similar criminal conduct is eventually arrested and prosecuted? Most of the time, if not all of the time, the answer is very simple - greed. And while there is certainly on the surface elements of greed in this case, the Defendant will in this memorandum urge this Honorable Court to delve a bit deeper beneath the surface. It is there, beneath the basic human frailty of indulgence, that lays another layer of truth.

However, before this occurs, it must be stated firstly that this additional layer of truth *does not exonerate Defendant*. It simply better helps to understand him. It is our goal in this sentencing submission to assist this Honorable Court in fully assessing the Defendant as a whole, not just his criminal conduct, so that it may reach a sentence that is sufficient but not greater than necessary under law.

## I.    Presentence Investigation Report

Undersigned counsel and the Defendant have no objections to the factual accuracy of the pre-sentence investigation report.

Undersigned counsel and the Defendant have no objections to the legal accuracy of the pre-sentence investigation report.

II.     **Sentencing Process**

In order to arrive at a sentence that is sufficient but not greater than necessary, and to comply with the purposes set forth in paragraph two of Title 18 United States Code Section 3553(a), the Defendant understands this Honorable Court will first calculate the Defendant's federal sentencing guideline sentence range, next consider any departures based on the criteria set forth in the federal sentencing guidelines from Sections 5K1.1 to 5K3.1, and, finally, consider whether the sentence imposed should be different from either the federal sentencing guideline sentence or the departure sentence (if any), after considering the factors set forth in 18 United States Code Section 3553(a).

- As stated above, the advisory federal sentencing guideline range as calculated by United States Probation is accurate.

- The parties do not expect any departures in the federal sentencing guidelines resulting from Sections 5K1.1 to 5K3.1 at sentencing.

- In this submission, the Defendant posits there is a basis for a downward variance.

An analysis of why there is a basis for a downward variance is set forth below in the next section of this sentencing submission and in open court based upon both defense and government filings.

III.    **Downward Variance Analysis**

There is no doubt the Defendant committed the crimes charged. Immediately after his residence was searched in the Orlando Division of the Middle District of Florida, and before he could even be indicted in the District of Arizona, the Defendant waived his right to be indicted by a grand jury and instead timely pled guilty to an information and to a government sponsored plea agreement.

And the Defendant did his level best to right his wrongs prior to his sentencing before this Honorable Court. The Defendant knows, and most importantly accepts, that now is the time that he must be punished for his criminal actions. But as this Honorable Court certainly knows better than anyone, a federal sentencing is not designed to punish alone. If so, there would be no need for a presentence investigation report, sentencing submissions by the parties and a sentencing hearing.

A.      *All of the Defendant's Criminal Conducted is Accounted for Under the Advisory Federal Sentencing Guidelines*

As stated above, the Defendant's criminal conduct is accurately addressed by the advisory federal sentencing guidelines. The advisory federal sentencing guideline imprisonment range is correct. This range however is the starting point, not the ending point, because there are other sentencing factors that must be considered by law.

The Title 18 United States Code Section 3553(a) factors a sentencing judge must take into equal consideration to the federal sentencing guidelines are as follows:

- The nature and circumstances of the offense and the history and characteristics of the defendant; 18 United States Code Section 3553(a)(1)

- The need for the sentence imposed; 18 United States Code Section 3553(a)(2):

  - to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, and
  - to afford adequate deterrence to criminal conduct, and
  - to protect the public from further crimes of the defendant, and
  - to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

- The kinds of sentences available; 18 United States Code Section 3553(a)(3)

- The need to avoid unwarranted disparity among defendants with similar records and similar crimes; 18 United States Code Section 3553(a)(6)

- The need to provide restitution to any victims of the offense. 18 United States Code Section 3553(a)(7)

Prior to the United States Supreme Court decisions in *United States v. Booker*, 543 U.S. 220, 245-67 (2005), *Rita v. United States*, 127 S.Ct. 2456 (2007), *Kimbrough v. United States*, 128 S.Ct. 558 (2007), and *Gall v. United States*, 552 U.S. 38, 53 (2007), the federal sentencing guidelines were mandatory, not advisory, on a federal sentencing judge. As we all know, as a result of the above

cases, the federal sentencing guidelines are now advisory in nature and equal in weight to the Title 18 United States Code 3553(a) factors.

Undersigned counsel is well aware this Honorable Court is well-versed in this area of the law and will now move forward in this sentencing memorandum (with such an understanding) to an application of fact and law analysis as a result.

B.     *None of the Defendant's Mitigation is Accounted for Under the Advisory Federal Sentencing Guidelines*

At the start of this sentencing submission there was some discussion of why the Defendant did what he did - and a promise to explore what triggered his unexpected criminal conduct at the young age of 17 and 18 years old. Did his criminal conduct the sole result of pure greed like so many others prosecuted by the government, defended by defense attorneys, and sentenced by district court judges like this Honorable Court?

No. At least not entirely. Please allow me to introduce you to Jordan Dave Persad.

*Personal and Family*

Jordan Dave Persad was born on November 17, 2002, at Jamaica Hospital in Queens, New York. He is the son of Dave Persad and Michelle Ramrattan, who were never married. Michelle had changed her first name from Ranchan to Michelle when she moved from Trinidad to the United States of America.

6

Until his early teenage years, Jordan lived in a seemingly happy household with Dave and Michelle, his three siblings, and his two maternal half-brothers. While the family members were relatively happy, they lived under somewhat austere circumstances. Their home was a two-bedroom roach-infested apartment in a low socioeconomic neighborhood. The trappings of poverty were all around them, but they stayed safe by avoiding homeless wanderers and people who had ill will. Neighborhood bullies and "wannabe gangsters" would harass Jordan daily. But Jordan had family members nearby, and he visited them to stay away from the negative influences.

One positive aspect of life in New York was the closeness of his neighbors. Everyone knew each other and watched out for each other. Some neighbors were so close that they could walk into each other's apartments without knocking. When he was 11 or 12 years old, Jordan was a bit "chubby," and his fellow students at school teased him. He became obsessed with weight loss, and he refused to eat and did sits ups every day to "get skinny." It worked. Jordan lost his excess weight.

When Jordan was 12 or 13 years old, his parents suddenly separated, and Michelle moved to Pennsylvania to live with her new boyfriend, Justin, whom she had met on a game called World of Warcraft. After the separation, everything for Jordan was "weird" and "off" for a while. He had not seen the breakup coming because he was always on his computer. His father Dave became severely

depressed. He stopped working and lost his apartment, so at age 14 or so, Jordan and his siblings had to move in with Michelle and Justin at the Justin's father's house in Elizabethville, Pennsylvania.

Jordan got along well with Justin. The two of them shared an intense interest in gaming, and Justin allowed Jordan to use his gaming computer setup anytime he wanted. Jordan quickly accepted Justin as a stepfather and Justin's father as a grandfather. All seemed well, but a few months later, tragedy struck. Jordan's new stepfather hanged himself, due to depression, in the grandfather's house, and Michelle found his body. The whole family took the suicide hard. Jordan decided to continue living with his grandfather, but Michelle and Jordan's siblings could not bear to live in the house where the suicide happened. They packed up and moved from Elizabethville to nearby Halifax, Pennsylvania, where they moved in with Dave, who by that time had moved there from New York.

Jordan struggled to deal with Justin's suicide, wondering if it might have been his fault. He became very quiet and reclusive, staying in his room on his computer and shutting himself off from everyone. Jordan had his one and only brush with juvenile authorities during this time. Jordan met his Justin's extended family. They seemed just like family to him, and they were a source of support for him. Eventually, though, Jordan was unable to continue living with his grandfather

because of what had happened in the house, so he moved in with the rest of his family.

In Halifax, Jordan noticed that it was "weird" for his mother and father to be together. He sometimes heard them fighting and arguing after they had been drinking. This would prevent him from sleeping, and he would be up late some nights just thinking. During this period, Jordan met a group of friends and made good memories with them. If he felt sad, depressed, or afraid, he took refuge on his computer, playing games or watching movies.

When Jordan was almost 16, he, Dave, and his siblings moved to Orlando, Florida and Michelle stayed behind in Pennsylvania. By the time Jordan was 17, his mother Michelle joined the family in Orlando. Michelle and Dave seemed to get along better than they ever had. Michelle told Jordan that they had put away their differences because they wanted to provide a good and peaceful environment for their children.

Through gaming, Jordan met a young man named Jarrod Cross online, and the two became best friends. Jordan also met a girlfriend, Ruba, who became a prominent figure in his life. Jordan and Jarrod had big plans of meeting in person one day, but tragedy struck again: Jarrod and his younger brother died on the same evening, in the same room, after ingesting fentanyl. When Jordan found out about Jarrod's death, he was devastated. He was both sad and angry. But Jordan did not

seek grief counseling. He shut everyone out and dealt with his friend's death alone-- in his head. In fact, Jordan preferred being alone because he believed he could cope better that way.

Jordan suffered another personal heartbreak when he was about 18. He and his girlfriend Ruba broke up, and she moved away to Saudi Arabia. Although the breakup was mutual, Jordan was devastated. He broke down and cried for two days, but, again, he did not reach out for help. He handled his loss alone.

Today, Jordan lives with his parents and siblings in Orlando, Florida. He and his mother have a close relationship. Jordan can go to her for anything and discuss anything with her. He loves her very much. Jordan is also close with his father and his siblings. All of Jordan's family members are confused over the criminal case and concerned about the outcome. They are all supportive.

Jordan's childhood dream was to be an FBI agent, but now his goal is to get past his criminal case and earn money so that he can make restitution to his victims and help make his parent's lives easier. He wants to set a good example for his brothers and sisters.

<u>Analysis</u>

Jordan's life has been marked by a series of significant challenges, transitions, and personal losses. His childhood began in less-than-ideal

circumstances, growing up in a modest apartment in a poor and dangerous area in New York.

The separation of his parents when he was around 12 years old and Michell's move to Pennsylvania marked a turning point in Jordan's life. This change left him feeling disconnected and "weird." He moved to Pennsylvania to be with his mother and her new boyfriend, who shared his passion for gaming. This period appeared to be stable until the tragic suicide of the boyfriend, which deeply affected Jordan and caused him to become more reclusive.

Jordan's subsequent move to Halifax, Pennsylvania and his observations of his parents' turbulent relationship further highlighted the instability in his life. During this time, he relied on gaming and friendships for emotional support.

Jordan's move to Orlando, Florida eventually reunited his family, and Jordan began forming healthier relationships, particularly with his parents. However, the tragic death of his friend Jarrod, and the loss of his girlfriend when she moved to Saudi Arabia, left Jordan emotionally scarred. He opted to cope with these losses by isolating himself and not seeking professional help or support from his family.

Today, Jordan strives to overcome his legal troubles and build a more stable life for himself and his family. He is dedicated to being a support and responsible family member, taking on the role with a sense of maturity.

Jordan's story reflects a young person who has faced significant adversity, loss, and trauma, coping with it in his own way, often by withdrawing into his own world. He has shown resilience in surviving these challenging, but seeking professional help and emotional support could be beneficial for his continued well-being and personal growth.

*Education*

Jordan attended public schools throughout his early years. He faced a significant setback when he had to repeat the eighth grade due to poor academic performance. Despite these academic struggles, Jordan had an ambitious goal: to become the first person in his family to graduate from high school.

Throughout his school years, Jordan did not particularly enjoy the educational process and admittedly did not take it as seriously as he should have. He endured some teasing due to his struggle with his weight, but through his hard work at diet and exercise, he lost weight and eliminated opportunities for teasing.

Jordan was quiet and reserved during his high school years, choosing not to engage in extracurricular activities. This lack of involvement might have contributed to his disengagement from the school environment and his studies.

Jordan attended high school through his junior year at Doctor Phillips High School, but he transferred to Evans High School in Orlando during his junior year due to a family move. It was during his senior year that he faced a pivotal decision.

He expressed his desire to withdraw from school, and his father gave this idea his reluctant blessing, knowing he would likely do it anyway.

While Jordan chose to leave formal education at this point, it is worth noting that he has expressed a desire to earn a high school diploma or GED in the future. This demonstrates that he still holds aspirations for further education and self-improvement.

<u>Analysis</u>

Jordan's educational background illustrates the interplay of personal motivation, family support, and external circumstances. His initial struggles in school, marked by repeating the eighth grade, reflect academic challenges that can often lead to disengagement. His goal of becoming the first graduate in his family highlights his determination to break the cycle of educational underachievement.

Jordan's lack of enthusiasm for school and his quiet demeanor may be indicative of disconnection from the educational system. But his decision to drop out, while a significant choice, is not necessarily an endpoint. Jordan's expressed desire to obtain a high school diploma or GED in the future demonstrates a willingness to continue his education, albeit through an alternative path. This showcases a recognition of the importance of education for personal and professional growth. Jordan's current desire for further education underscores the potential for future educational achievements, even after leaving formal schooling.

*Mental Health*

Jordan's life has been marked by a series of profoundly challenging and traumatic events, including the suicide of his stepfather, the loss of a dear friend due to a drug overdose, and the end of a meaningful relationship. Despite these traumatic experiences, Jordan has never sought the assistance of a mental health professional. He has chosen to cope with these emotional wounds independently, and while he may not display overt symptoms of emotional problems or mental health issues, it is essential to analyze his mental and emotional health and consider whether evaluation and treatment might be beneficial.

<u>Analysis</u>

Jordan's ability to endure traumatic experiences without professional help is remarkable, demonstrating inner strength. However, it is crucial to understand that one's emotional well-being is a complex matter, and the effects of trauma can manifest differently in each person.

The suicide of Jordan's stepfather is a particularly distressing event that can have lasting emotional repercussions. It may result in feelings of guilt, confusion, or sadness. The loss of a close friend and a girlfriend compounds these challenges. Jordan's reluctance to seek counseling or treatment might stem from various factors, including societal stigma, fear of judgment, or a belief in self-reliance.

Seeking evaluation and treatment can offer several benefits. A mental health professional can provide a safe space for Jordan to express his emotions, validate his experiences, and help him process these traumatic experiences in a health way. It can also assist in identifying and addressing any potential signs of post-traumatic stress disorder, depression, or anxiety that might develop over time.

While Jordan may not exhibit severe mental health issues, his history of traumatic events suggests that seeking evaluation and treatment could be beneficial for his long-term emotional well-being. A mental health professional could provide support, suggest coping strategies, and brokering interventions to help Jordan thrive after enduring significant trauma.

*Sexual Abuse*

During a family visit when Jordan was 10 years old, an older female cousin who was 15 or 16 years old sexually abused him. The cousin invited Jordan to play in a bedroom. While the two were on the bed, the cousin would fondle Jordan's genitals and then put Jordan's hand under her panties and insist that he masturbate her. Jordan was traumatized by the sexual abuse, but he never told his parents or anyone else.

Analysis

Experiencing sexual abuse can be profoundly traumatic, especially for a young personal. It can have long-lasting emotional, psychological, and even

physical effects. Many survivors, like Jordan, may not immediately disclose their abuse die to fear, shame, or confusion.

Jordan likely needs support and understanding and possibly even professional assistance in processing his childhood sexual abuse. Addressing this issue in a sensitive and supportive manner is critical.

*Substance Abuse*

Jordan's substance abuse history tells a relatively low-risk story. At 19 years old, he began experimenting with alcohol. The fact that he never developed a specific pattern of alcohol use suggests that he did not engage in regular heavy drinking, which is often an early indicator of problematic alcohol consumption. Jordan's alcohol use is moderate and occasional, which is a responsible approach to drinking. He has not allowed alcohol to become a problem in his life.

Prior to this case, Jordan used marijuana infrequently to deal with stress and anxiety. He should be cautious about using marijuana as a coping mechanism and consider alternative strategies for managing anxiety, such as therapy or relaxation techniques.A notable positive aspect of Jordan's history is his lack of experience with other types of drugs. Avoiding experimentation with other drugs reduces the risks associated with drug misuse and addiction.

Analysis

Thankfully Jordan's substance abuse history is relatively little. He has maintained a responsible approach to alcohol use, avoiding addiction. He must remain aware of the potential pitfalls of using marijuana for anxiety management and consider alternative strategies to ensure his long-term well-being. An evaluation may prove useful to identify any potential for substance abuse issues.

*Employment*

After withdrawing from high school, Jordan shifted his focus towards unconventional ways of earning money, primarily in the online world. Jordan dabbled in various activities, such as gaming and investing, that eventually led to some profit. These endeavors allowed him to earn a good income, but they also led him to his current legal troubles.

While Jordan's online pursuits provided a source of income, they eventually landed him in a legal predicament. This predicament has had a significant impact on his life and employment prospects. More recently, Jordan took a part-time job at his father's construction company. This employment served as a welcome shift from his online activities and was a valuable experience in the traditional workforce.

Jordan is currently unemployed. He has had difficulty securing and maintaining employment at his father's work due to problems at home, lack of transportation, and his current legal case.

Analysis

Jordan's aspiration to secure full-time employment is a promising sign of his determination to address his legal obligations and make restitution. Job placement assistance, counseling, and addressing his legal situation are essential steps for Jordan to work towards a more stable future.

**IV.    Analysis of United States Probation's Comments and Recommendations**

A.

United States Probation states, "It is noted the defendant appears to show a lack of remorse and has stopped working despite knowing restitution would be necessary to pay back the victims."

United States Probation saw what we have saw all along: an immature kid who has a flat affect and a dry, detached personality. The Defendant does not lack remorse. He simply does not know how to express it in an adult, pro-social manner. The Defendant has spent more time on his computer than he has in the real world. Over the course of our attorney-client representation, the Defendant has talked ad nauseam about his 'best friend'. It was not until recently we learned the

Defendant has never met his 'best friend' in person. The Defendant lives in a virtual world.

Emoting is not in the Defendant's repertoire. This is what United States Probation saw. It is not a lack of remorse. To the contrary, after the Defendant pled guilty, and met with United States Probation, the Defendant and undersigned counsel met outside of the federal courthouse while awaiting our respective Ubers (the Defendant to his hotel and undersigned counsel to the airport). The Defendant shocked undersigned counsel by suddenly hugging him and thanking undersigned counsel for caring him for him like he was family. He cried as he explained he has ruined his life and his family's life by his selfish and criminal actions. The Defendant was awkward in his embrace of undersigned counsel, but his emotion was real.

B.

United States Probation considered but did not make a recommendation for a downward departure based on the Defendant's age.

While his actions were reprehensible and criminal, it is important to remember the Defendant was an eighteen year old when this started. And, as already explained, he was not even a typical eighteen year old kid. The Defendant lived on his computer, and he simply did not appreciate the world around him in a way a mature adult would have. On a computer, money just looks like some

numbers strung together, but in reality, it represents hard work. The Defendant, while knowing what he was doing was wrong, did not fully appreciate the victims' struggles, because he was not fully emersed in the real world and not yet a fully formed, mature adult.

C.

United States Probation considered a downward variance pursuant to 18 United States Code Section 3553(a) factors, but decided a federal sentencing guideline sentence is necessary to address the severity of the offense and to deter others from committing similar crimes.

There is no doubt the Defendant committed a severe crime. However, he has no prior record and certainly has never seen a jail cell. He is just over five feet tall and not even 140 pounds. And he is about to enter a federal prison system where inmates of his stature could end up a prey, especially inmates of his stature who are young and immature. A sentence below the guideline range will most certainly scare the ever living day lights out of the Defendant and impress on him the gravity of his offense. Federal prison will not help the Defendant mature. Federal prison will not provide effective correctional treatment. Federal prison is not a panacea. A very short term of prison followed by intensive community supervision will be much more effective in this case. The Defendant should not be given up on at this age and stage in his life.

## V.     Other Mitigating Factors

Undersigned counsel will address other mitigating factors, sensitive in nature, at the Defendant's sentencing.

## VI.    Requests for Judicial Recommendations

The Defendant understands judicial recommendations are just that – mere judicial recommendations. The Defendant understands there is no guarantee that a judicial recommendation will result in action. However, relevant law and prison policy state more weight is given to a judicial recommendation if there is a factual basis on the record for the judicial recommendation.[1] The Defendant therefore makes the following respectful requests for judicial recommendations and in support offers a factual basis for each request.

If incarcerated, the Defendant respectfully requests a judicial recommendation of a prison camp and a judicial recommendation of a prison camp designation at Coleman FPC in Coleman, Florida. As a basis for this request, the Defendant has family and friends who live in the greater Orlando, Florida area,

---

[1] The Bureau of Prisons welcomes judicial recommendations and, by statute and its own policy, is required to consider them. *See* 18 U.S.C. Section 3621 and Program Statement 5100.08, "Inmate Security Designation and Custody Classification". Pursuant to the above statute, the Bureau of Prisons is required to consider the type of offense, the length of sentence, the defendant's age, the defendant's release residence, the need for medical or other special treatment, any placement recommendation made by the court, and all guidance issued by the United States Sentencing Guidelines. Therefore, while the Bureau of Prisons has the sole authority to designate the place of confinement for federal prisoners, if a defendant's judgment and conviction indicates the district court's preference for housing the inmate within a specific institution, geographic area, or specialized program, it must be considered, and every effort will be made to fulfill the district court's recommendation request should there be reasons on the record to support the request.

which is a within a half day's drive of Coleman, Florida. Having contact with family and friends will help the Defendant positively matriculate through his federal prison experience.

## VII.   Sentencing Position

The issue therefore before this Honorable Court is whether a sentence within the federal sentencing guideline imprisonment range is sufficient but not greater than necessary to comply with the law.

Once this Honorable Court calculates the Defendant's final offense level under the advisory federal sentencing guidelines, based on the criteria set forth in the federal sentencing guidelines from Sections 5K1.1 to 5K3.1, and then considers whether the sentence imposed should be different from either the federal sentencing guideline sentence or the departure sentence (if any), and after considering the factors set forth in 18 United States Code Section 3553(a), the Defendant respectfully suggests a sentence within the advisory federal sentencing guideline imprisonment range is not reasonable because it is greater than necessary to comply with the law.

A guideline sentence is therefore contrary to the law and should not be imposed. For the reasons stated in this sentencing memorandum, the Defendant respectfully requests a sentence of less than the advisory federal sentencing guideline range to as low as this Honorable Court deems reasonable under the law.

## VIII.  Conclusion

And thus, here we are. The Defendant's plea has been accepted by this Honorable Court. Sentencing memorandums have been filed by the parties. The Defendant now awaits his fate. But it cannot be overstated that from the moment of his arrest to the present day, the Defendant did what he could to shape his fate in a positive way. This is exampled by his immediate accepting of responsibility by pleading guilty to an information and a government sponsored plea agreement and engaging in other, *positive* activities that will be addressed by both parties at sentencing. That being said, there is no doubt the Defendant will be punished.

The only issue left for this Honorable Court is how and for how long.

How much time is enough time for a 21-year old man, who was actually a minor when he began the criminal conduct that led to this case, with no criminal history and a complex history with his family?

The Defendant posits not as much as the advisory federal sentencing guidelines state. The Defendant respectfully requests a downward variance for all of the mitigation that is not accounted for by the advisory federal sentencing guidelines.

Respectfully submitted on October 12, 2023.

Respectfully submitted,

By: /s/ Mark J. O'Brien
Mark J. O'Brien, Esquire
Florida Bar No.: 0160210
511 West Bay Street
Suite 330
Tampa, Florida 33606
T:      (813) 228-6989
E:      mjo@markjobrien.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on October 12, 2023 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will then send notice of electronic filing to all counsel of record.

By: /s/ Mark J. O'Brien
Mark J. O'Brien, Esquire